IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID W. PENNEY,                    §
                                    §
     Plaintiff,                     §
                                    §
vs.                                 §    Civil Action No. H-06-3746
                                    §
OFFICER WOLSEY, TEXAS STATE         §
TROOPERS, TEXAS DEPARTMENT OF       §
PUBLIC SAFETY, STATE OF TEXAS,      §
and DOES I - L,                     §
                                    §
     Defendants.

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] is Defendants' Motion for Summary Judgment (Docket Entry No. 49).  The court has considered the motion, all relevant filings, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Defendants' motion be **GRANTED IN PART** and **DENIED IN PART**.

**I.  Case Background**

On December 14, 2005, David Penney ("Plaintiff") was traveling eastbound on Interstate 10 ("I-10") when he was pulled over by Trooper Roger Wolsey ("Defendant Wolsey" or "Wolsey"), a law enforcement officer employed by the Texas Department of Public Safety ("TDPS").[2]  The summary judgment record shows the following.

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Docket Entry No. 4.

[2]     Plaintiff's Verified Complaint, Docket Entry No. 1, Ex. 1, Plaintiff's Declaration (hereinafter "Plaintiff's Declaration"), p. 1; Defendants' Motion for Summary Judgment Appendix, Docket

## A.   __Videotape of the Incident__

Defendants provided the police videotape of the incident.[3]  It shows that Plaintiff was stopped by Defendant Wolsey at 7:10 p.m. at mile marker 718 on I-10.  Before he left his vehicle, Wolsey checked the Washington State registration of Plaintiff's vehicle and was told that it was registered to Crescent Leasing in Albuquerque, New Mexico.  Wolsey informed Plaintiff that he had reached a speed of seventy miles per hour several times in a sixty-five miles per hour zone before reducing his speed to sixty-five miles per hour.  When Plaintiff responded that he was merely following the car ahead of him, Wolsey agreed but repeated that he had clocked Plaintiff's speed at seventy on radar before Plaintiff slowed to sixty-five.  After Plaintiff handed Wolsey his driver's license, Wolsey asked, "You from Ontario?"[4]  Plaintiff answered that he had property there and offered no further explanation.

Wolsey asked Plaintiff to get out of his truck and into the patrol car where it was warmer.  Wolsey asked if Plaintiff had any weapons on his person, such as a knife, and Plaintiff responded no initially, then stated that he had a pocket knife.  Wolsey instructed Plaintiff to leave the knife in his car.  Wolsey patted

---

Entry No. 50, p. 1, Affidavit of Roger Wolsey (hereinafter "Wolsey Affidavit").

[3]    Docket Entry No. 51, Videotape of traffic stop.

[4]    Ontario, Canada, borders the states of Minnesota, Michigan, Ohio, Pennsylvania and New York.

Plaintiff's pants pockets down as Plaintiff pulled on a jacket. Once inside the patrol car, Plaintiff reiterated that he was just following the car in front of him and trying to keep up with the flow of traffic.  Wolsey explained that Plaintiff's was the first vehicle that he determined was exceeding the speed limit as he approached from behind.

In response to Wolsey's questions, Plaintiff related that his truck was leased by his veterinary practice, that he works mostly in California and, in the winter, he "comes down here."  Plaintiff stated that he was moving furniture belonging to a friend who had evacuated from "the Gulf" because of Hurricane Katrina and now wanted to return and that he had offered to drop it off as he drove to his final destination.  Plaintiff explained that his trip began in the Washington State area.  Wolsey asked where in Washington he was from, and Plaintiff responded, "Seattle, when I'm in Washington."  He stated that he drove to California to pick up the furniture and then to I-10 to drive to the Gulf coast.  When asked specifically where he was going, Plaintiff stated "New Orleans, or maybe Biloxi, I'm not sure, depending on where her friends tell me to go once I get to New Orleans."

Wolsey gave Plaintiff a warning ticket and told him to watch his speed.  Plaintiff responded that he did not realize he was speeding.  Wolsey then asked what Plaintiff's final destination was.  Plaintiff stated that he was going to Clemson, South

Carolina, to see his nephew graduate and to visit family in Charlotte, North Carolina, and Columbia, South Carolina. Plaintiff stated that he had lived in Washington for four years "off and on," but he was not normally there because he was usually in Canada or California.

At that point, at 7:18 p.m., Wolsey asked the dispatcher to check Plaintiff's Ontario driver's license.   While they were waiting, Wolsey asked about Plaintiff's employment.   Plaintiff restated that he was a veterinarian in private practice and had a clinic in San Francisco, California.  Wolsey asked how it was that Plaintiff was moving around so much and Plaintiff responded that he only worked part-time "here and there" as a relief veterinarian and did not work in California, which he corrected to Canada, during the winter months.  Wolsey asked Plaintiff his route, and Plaintiff responded that he was taking I-10 to 59 to 85 "or something like that," but appeared a little confused about the route when Wolsey pressed him on it.  Later, when Wolsey reintroduced a discussion of Plaintiff's planned route, Plaintiff admitted that he had not checked to see if he could get through Mississippi on I-10.  At 7:23 p.m., Plaintiff's driver's license check came back clear.

Wolsey asked Plaintiff if there was anything he was traveling with for protection, such as knives, and Plaintiff responded only the pocket knife.  Wolsey also asked if there was anything in his truck that came from California, San Antonio or Washington "that

4

anyone would consider that you shouldn't be carrying?"  Plaintiff
stated that, if Wolsey was asking if he used drugs, "no way, like
I am a licensed veterinarian and I don't touch that stuff."  Wolsey
clarified that he was asking if Plaintiff was carrying drugs, not
using drugs.  Plaintiff angrily denied carrying illegal drugs.
Wolsey asked if Plaintiff was traveling with any veterinary
products such as steroids.  Plaintiff again denied having any
illegal drugs or veterinary supplies in his truck.

Wolsey asked if Plaintiff had any objection to a search of his
truck.  Plaintiff responded that he would not consent to a search.
Wolsey radioed for a canine unit at 7:25 p.m.  Wolsey explained
that Plaintiff would be free to go after the canine unit determined
that "everything was okay," but if the dog alerted, then
Plaintiff's vehicle would be searched.  Plaintiff stated that he
did not associate with people who used drugs and did not have
veterinary medication in the truck either.

At 7:28 p.m., Plaintiff left the patrol car to retrieve his
keys from the truck.  Plaintiff waited several minutes outside his
vehicle before asking if he could return to the patrol car because
he was cold.  Wolsey agreed but said he would have to pat Plaintiff
down again.  At that point, Plaintiff admitted that he had pepper
spray in his jacket pocket that he had forgotten was there.
Plaintiff explained that he needed the pepper spray because he
worked around animals and asked if he could get it back.  Wolsey

5

responded that he would not return the pepper spray because it was a weapon.   Plaintiff stated that he had concealed weapon permits from three different states but he did not have them with him.

Another patrol unit arrived at 7:37 p.m.  Wolsey informed the other officer that a visual search through the truck's windows showed several chairs sitting on top of items that were completely covered by a tarp or blanket.[5]

The canine unit arrived at 7:50 p.m.  Defendant Edgar Gonzalez ("Defendant Gonzalez" or "Gonzalez"), the canine officer, walked the dog around Plaintiff's truck several times, making him jump at several places to smell the windows at the back of the truck.  The dog jumped up at the front passenger window and began scratching the passenger door.  Defendant Wolsey explained to Plaintiff that the dog alerted, which provided probable cause to search his truck. Because both officers were involved in searching the truck, they handcuffed Plaintiff, explaining to him that it was for their protection, not because he was under arrest.  Plaintiff was placed in a double set of handcuffs at 7:59 p.m.

At 8:09 p.m., Wolsey discovered a bag of pharmaceuticals, medical supplies and syringes in Plaintiff's vehicle.   When confronted by the officers about the presence of veterinary supplies, Plaintiff stated that he had forgotten those items were

---

[5]    The video shows that Plaintiff's truck had a covered top over the truck bed.

6

in his truck and that he had intended to donate them to the Milo Foundation, a nonprofit organization in New Orleans. Officer Wolsey asked Plaintiff if there was any crack cocaine in the vehicle or if he had ever smoked crack cocaine. Plaintiff answered no to both questions. Plaintiff did not complain about his handcuffs during this conversation.

The officers decided to take some of the items out of the truck to better allow the dog to sniff the items inside and outside the vehicle. More medical supplies were discovered. Between 8:24 and 8:25 p.m., the dog sniffed the items on the ground. Defendant Wolsey told Plaintiff that the dog alerted to a briefcase and asked for the combination so that it might be opened. Plaintiff refused and voiced his opinion that the dog had not alerted to the briefcase.[6] Plaintiff did not complain about his handcuffs at that time. Wolsey forced the lock to the briefcase and discovered a firearm inside. When confronted about the firearm, Plaintiff stated that he had a concealed handgun permit in his wallet but did not inform the officers about the firearm because of his belief that they were conducting an illegal search. Plaintiff did not complain about his handcuffs during this conversation with Wolsey.

At 8:38 p.m., the dog sniffed the inside of the truck's cab and alerted. At 8:39 p.m., the dog searched the truck bed. The officers continued to examine the inside of the truck where the dog

---

[6] This part of the dog search was conducted off-camera.

had alerted.  At 8:54 p.m., the officers concluded their search and began to repack the truck.  By 9:10 p.m., the truck was repacked. The videotape ends as Defendant Wolsey re-enters his patrol car.

**B.    Plaintiff's Account of the Incident**

According to Plaintiff's declaration, he was pulled over at approximately 7:00 p.m. about fifty miles west of Houston on I-10.[7] Plaintiff stated that he was "traveling in the right lane at the speed limit in heavy traffic" when he was stopped by Defendant Wolsey.[8]  He further stated that "the vehicles in the right lane were all traveling around sixty-five miles per hour (the speed limit) with minor fluctuations."[9]

After Plaintiff was pulled over, Defendant Wolsey asked him if he had any weapons.[10]  Plaintiff initially said no, but after Wolsey specifically asked him whether he had a pocketknife, Plaintiff replied: "Oh yeah, I do have one of those."[11]  Defendant Wolsey told Plaintiff to leave the knife in the truck and asked Plaintiff to join him outside.[12]  Plaintiff handed the officer his driver's

---

[7]     Plaintiff's Declaration, p. 1.

[8]     Id. at 1.

[9]     Id.

[10]    Id. at 2.

[11]    Id.

[12]    Id.

8

license.[13]  Defendant Wolsey asked Plaintiff what was in the back
of the truck and Plaintiff told him that it was furniture and
personal items for a friend.[14]  When Defendant Wolsey asked
Plaintiff where he was going, Plaintiff responded, "The Gulf."[15]
When Wolsey asked for more specifics, Plaintiff told him New
Orleans or Biloxi, depending upon where his friend wanted her items
delivered.[16]  From there, Plaintiff said he was going to North and
South Carolina to visit relatives.[17]

Defendant Wolsey then suggested that Plaintiff sit in the
patrol car because of the cold.  Before doing so, Wolsey patted
down Plaintiff.[18]  At that time, Plaintiff said, he remembered the
pepper spray in his coat and reached in his pocket to remove it.[19]
Wolsey told Plaintiff not to reach in his pocket, and instead,
Wolsey removed the pepper spray himself.[20]  He asked Plaintiff what
it was used for and Plaintiff told him that he was a veterinarian

---

[13]    _Id._

[14]    _Id._

[15]    _Id._

[16]    _Id._

[17]    _Id._

[18]    _Id._

[19]    _Id._

[20]    _Id._

and used it to protect himself from animals.[21]  After they got into Defendant Wolsey's car, Wolsey continued to question Plaintiff about where he was going and how he planned to get there.[22] Plaintiff stated that  Wolsey repeatedly challenged his answers and accused him of not knowing where he was going or what he was doing.[23]

According to Plaintiff, Wolsey asked him if he could take a look in the back of his truck, to which Plaintiff replied, "I do not consent to any search of my property."[24]  Wolsey asked Plaintiff if he had any drugs in the vehicle, and Plaintiff said no.[25]  While waiting for the canine unit to arrive, Defendant Wolsey asked Plaintiff if there was anything in the truck that the officers should know about so that the dog could properly do his job.[26] Plaintiff replied, "I'm not doing anything illegal.  There's nothing in the truck of any consequence, not even veterinary drugs."[27]  Plaintiff related that, once the canine unit arrived, the

---

[21]  <u>Id.</u>

[22]  <u>Id.</u>

[23]  <u>Id.</u> at 2-3.

[24]  <u>Id.</u> at 4.

[25]  <u>Id.</u>

[26]  <u>Id.</u>

[27]  <u>Id.</u>

dog ran around the truck twice with no signal.[28]   Plaintiff stated he then "observed the dog officer bring the dog up to the passenger side door of the truck and command him to jump on the door and scratch on it."[29]

Wolsey informed Plaintiff that the dog alerted and that he was going to search Plaintiff's vehicle.[30]   Plaintiff again stated that he did not consent, to which, Plaintiff testified, Wolsey replied, "You don't have to consent to the search.   The dog scratching at the door is enough for probable cause.   I'm going to detain you now and have to put handcuffs on you while I search and you sit in the car."[31]

Plaintiff said that he asked Wolsey to cuff his hands in front of him because he has an "illness in [his] muscles."[32]   Plaintiff, who suffers from Charcot Marie Tooth disease, described his illness as one that had resulted in atrophy of the muscles in his hands and wrist.[33]   He claimed it was "plain and obvious to the untrained eye" that he had virtually no muscle tissue protecting his bones and

---

[28]   Id. at 5.

[29]   Id.

[30]   Id.

[31]   Id.

[32]   Id.

[33]   Id.

that placing handcuffs behind his back would be very painful.[34]
Wolsey refused to put the handcuffs on as requested, but did add a
second pair so Plaintiff was more comfortable.[35]  Plaintiff remained
in the police car while Defendants searched his truck and was
eventually joined by another officer.[36]

Plaintiff stated that he repeatedly told the officers that his
shoulders and arms were hurting and suggested the handcuffs be put
in front of him, but the officers refused.[37]  In an attempt to
relieve the pressure on his shoulders and upper arms, Plaintiff
stated, he sat on his hands and the restraints, which twisted his
back.[38]  He said that he continued to "experience pain and spasm
from [the] detention and had to seek medical intervention."[39]

Plaintiff reported that, as he sat in the back of the police
car, the officers pulled everything out of the back of the truck
and examined its contents.[40]  One of the officers pulled out several
bags of veterinary supplies.[41]  Wolsey approached Plaintiff with a

---

[34]     Id.

[35]     Id.

[36]     Id.

[37]     Id. at 6.

[38]     Id.

[39]     Id.

[40]     Id.

[41]     Id.

locked black briefcase he claimed to have found in the truck's cab
and asked for the combination.[42]   Plaintiff asked Wolsey where he
found the briefcase and told him he did not consent to a search.[43]
Plaintiff stated that Defendant Wolsey responded that he would
break it open if not given the combination.[44]   Plaintiff again
refused consent.[45]   Wolsey broke open the case and found a firearm.[46]
When asked why he did not tell the officers about the weapon,
Plaintiff replied, "I didn't realize the briefcase was in the
truck.   It must have been behind the seat."[47]   According to
Plaintiff, when Defendants accused him of having a selective
memory, he explained that he did not know the gun was there and
also had forgotten he had packed medical supplies.[48]   He attributed
his forgetfulness to his illness.[49]   At another time during the
search, Plaintiff asserted one of the officers "yelled at [him] as
if crazed, 'Do you use crack cocaine?! Do you smoke crack

---

[42]   Id.

[43]   Id.

[44]   Id.

[45]   Id. at 7.

[46]   Id.

[47]   Id.

[48]   Id.

[49]   Id.

cocaine?!'"[50]

After Defendants completed their search, they put the items back into the truck.[51]  Plaintiff was instructed to get out of the patrol car so the handcuffs could be removed.[52]  One of the officers assisted Plaintiff out of the car after he indicated that he did not have any balance and his muscles were "all messed up from sitting . . . handcuffed" as he was.[53]  When Plaintiff returned to his truck, he noticed that several items had not been replaced in his truck, a panel on the passenger side door was hanging from a wire, a toy had been "cut open and destroyed," and the cab smelled of dog feces.[54]  Plaintiff stated that Wolsey told him he had to sign a warning ticket before he was free to leave.[55]  In his declaration, Plaintiff stated that the warning ticket reflected that he was traveling at sixty-five miles per hour.[56]  Although Plaintiff stated that it was against his principles to sign the ticket, he did so because he was afraid not to.[57]

---

[50]    <u>Id.</u>

[51]    <u>Id.</u> at 8.

[52]    <u>Id.</u>

[53]    <u>Id.</u>

[54]    <u>Id.</u> at 9.

[55]    <u>Id.</u>

[56]    <u>Id.</u>

[57]    <u>Id.</u>

Plaintiff stated he "trembled for hours as [he] drove and even thereafter," and that he was unable to sleep for several days following the incident out of "apprehension and a pervasive sense of vulnerability."[58]   He claimed he was "nervous and distressed" every time he drove through Texas.[59]

### C.   **Defendants' Accounts of the Incident**

#### 1.   Defendant Wolsey

Defendant Wolsey, a nine-year veteran with the TDPS, recalled the events of December 14, 2005, differently.  While on patrol on I-10, Wolsey determined by radar that Plaintiff was traveling seventy miles per hour, five miles over the speed limit.[60]  Wolsey stopped Plaintiff's vehicle.  He also observed that Plaintiff's license plate was obstructed.[61]  Wolsey determined that Plaintiff's car was owned by a leasing company and leased in a state other than Plaintiff's claimed state of origin.[62]  Wolsey averred that during his initial questioning, Plaintiff was vague about his travel plans, failed to maintain eye contact, and his hands were shaking.[63]

Wolsey's affidavit states that, after the drug dog performed

---

[58]     Id. at 10.

[59]     Id.

[60]     Wolsey Affidavit, p. 1.

[61]     Id.

[62]     Id. at 1-2.

[63]     Id. at 2.

a free air "search" of Plaintiff's vehicle, Defendant Gonzalez informed Wolsey that the dog alerted.[64]  When Wolsey put Plaintiff in hand restraints prior to the vehicle search, Plaintiff informed him that he had a neurological disease.[65]  Wolsey stated that he "used two sets of hand restraints to lengthen the arm movement, connecting one set to another and then placing them on Dr. Penny behind his back."[66]  Wolsey handcuffed Plaintiff in accordance with his understanding of TDPS policy.[67]   Plaintiff was placed in Wolsey's patrol car while the officers searched his vehicle.[68] Defendant Wolsey reported in his affidavit that the dog alerted again both inside the vehicle and on a briefcase.[69]  A gun was found inside the briefcase and veterinary drugs were found inside the vehicle, but no illegal narcotics were discovered during the search.[70]  Following the search, Plaintiff was released.[71]

### 2. Defendant Gonzalez

Defendant Gonzalez, a certified dog handler who began working

---

[64]     Id.

[65]     Id.

[66]     Id.

[67]     Id.

[68]     Id.

[69]     Id.

[70]     Id.

[71]     Id.

for TDPS in 2002, testified that both he and the dog were certified at the time of the incident.[72] He explained that the dog used in this case is an "aggressive alert," meaning that his signals may include, but are not limited to, "scratching, biting, change in breathing pattern, sniffing at an area where he has not been directed, or generally changing his normal behavior."[73]

Gonzalez's affidavit indicates that he was contacted by a dispatcher to assist Defendant Wolsey at 7:35 p.m. and arrived at the scene at 7:56 p.m.[74] Gonzalez reported that the dog alerted to the passenger side door, the inside passenger floorboard, and Plaintiff's briefcase.[75] Gonzalez informed Wolsey of the alerts.[76] According to Gonzalez, various veterinary drugs and a firearm were found during the search.[77] No illegal drugs were found in the vehicle, and Plaintiff was not arrested.[78]

D.    **Procedural History**

Plaintiff filed this action on December 27, 2006, asserting

---

[72]    Gonzalez Affidavit, p. 4.

[73]    Id. at 4-5.

[74]    Id. at 5.

[75]    Id. Defendant Gonzalez's affidavit states that these alerts indicate the presence of illegal narcotics, including "marijuana, methamphetamine, heroin, cocaine and/or hashish."

[76]    Id.

[77]    Id.

[78]    Id.

17

both federal and state claims.[79]   Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff asserts constitutional claims for unlawful seizure, unlawful arrest, unreasonable search, use of excessive force, and interference with the right to travel.[80] Plaintiff also brings a claim under the Americans with Disabilities Act ("ADA").[81]   He asserts the following state law causes of action: violation of article I, sections 3 and 9, of the Texas Constitution; trespass and conspiracy to commit trespass; false arrest and imprisonment and conspiracy to falsely arrest and imprison; fraud and falsification of evidence and conspiracy to defraud and falsify evidence; harassment; retaliation; felony assault and battery; intentional infliction of emotional distress; negligent infliction of emotional distress; malicious prosecution; abuse of process; conversion; negligence; gross negligence; and

---

[79]   Plaintiff's Verified Complaint, Docket Entry No. 1, p. 1.

[80]   Plaintiff's First Amended Complaint ("Complaint"), Docket Entry No. 18, p. 1.

[81]   Id. at 2.  In a previous opinion in this case, in which Plaintiff's claims against the Texas Department of Public Safety and State of Texas were dismissed, this court determined that Plaintiff failed to allege sufficient facts to support a claim under the Rehabilitation Act or the ADA.  See Memorandum and Recommendation, Docket Entry No. 38, p. 5 ("Plaintiff must do more than merely allege that he is disabled to state a claim under either the Rehabilitation Act or the ADA."); Order Adopting, Docket Entry No. 44.  Pursuant to its July 5, 2007, Memorandum, and Plaintiff's failure to amend his complaint to properly allege an ADA claim at the court's instruction, Plaintiff's claims under the ADA and Rehabilitation Act should be **DISMISSED**.  See Minute Entry Order dated February 15, 2007, Docket Entry No. 14; Hearing on February 15, 2007; see also Lozano v. Ocwen Federal Bank, FSB, 489 F.3d 636, 642 (5th Cir. 2007) (recognizing that a district court may dismiss a claim sua sponte for failure to state a claim as long as the plaintiff is provided prior notice and the opportunity to respond).

respondeat superior.[82]

Plaintiff seeks an injunction barring the use of canine units to establish probable cause for car searches, an injunction requiring that officers be trained to better accommodate drivers with disabilities during traffic stops, compensatory damages in the amount of one hundred million dollars, punitive damages, and a declaration that the Texas Tort Claims Act is unconstitutional.[83] Plaintiff's claims were initially asserted against Defendants Wolsey, Doe I, Gonzalez (Doe II), the officers' commanding officers (Does III-L), the TDPS and/or Texas State Troopers, other agencies, and the State of Texas.[84] Plaintiff's claims against the TDPS and the State of Texas were previously dismissed by this court pursuant to the State of Texas's Eleventh Amendment immunity.[85] The only parties remaining in the lawsuit are Wolsey and Gonzalez.[86]

---

[82]    Complaint, Docket Entry No. 18, p. 2.

[83]    See id. at 13.   In his complaint, Plaintiff also requested the termination of the officers involved in the stop and search of his vehicle; however, in his opposition to Defendants' motion for summary judgment, he withdraws this demand.  Plaintiff's Opposition to Motion for Summary Judgment ("Plaintiff's Opposition"), Docket Entry No. 56, p. 2.

[84]    Complaint, Docket Entry No. 18, p. 1.

[85]    See Memorandum and Recommendation, Docket Entry No. 38, p. 9; Order Adopting, Docket Entry No. 44.   Plaintiff also identifies the Texas State Troopers as a defendant.  As a division of the TDPS, claims against the Texas State Troopers are also barred by the Eleventh Amendment and sovereign immunity, and were, thus, included in those claims previously dismissed by this court.

[86]    Defendants Wolsey and Gonzalez were the only individual Defendants served in this case.  Doe I and Does III-L were not identified within the two-year statute of limitations under 42 U.S.C. § 1983.   See Piotrowski v. City of Houston, 237 F.3d 567, 576 (5th Cir. 2001); Pete v. Metcalfe, 8 F.3d 214, 217 (5th Cir. 1993).  Even if Plaintiff were to now amend his complaint to identify said

Defendants Wolsey and Gonzalez filed this motion for summary judgment challenging only Plaintiff's constitutional claims.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex

---

individuals, it would not relate back to the commencement of the litigation.  See Jacobsen v. Osborne, 133 F.3d 315, 321-22 (5th Cir. 1998).  Thus, Plaintiff's claims against Doe I and Does III-L should be **DISMISSED**.

Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  Celotex Corp., 477 U.S. at 322.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."  Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

The nonmoving party must show more than "some metaphysical doubt as to the material facts."  Meinecke v. H & R Block, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden.  Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

### III.  Analysis

A plaintiff can establish a prima facie case under 42 U.S.C. § 1983[87] by alleging: 1) a violation of a federal constitutional or statutory right; and 2) that the violation was committed by an individual acting under the color of state law.  Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir. 1995).  The statute creates no substantive right, but provides remedies for deprivations of rights created under federal law.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Governmental officials are protected by qualified immunity from 42 U.S.C. § 1983 suits when they perform discretionary functions insofar as "the official's acts were objectively reasonable in light of then clearly established law."  Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001)(citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In order to overcome an assertion of qualified immunity, a plaintiff bears the initial burden of showing that the actor's conduct violated a

---

[87]    The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

22

constitutional or statutory right.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002); <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001); <u>Williams v. Kaufman County</u>, 352 F.3d 994, 1002 (5th Cir. 2003).  The inquiry ends if the allegations do not support a finding of constitutionally impermissible conduct.  <u>Saucier</u>, 533 U.S. at 201; <u>Mace v. City of Palestine</u>, 333 F.3d 621, 623 (5th Cir. 2003).

If the plaintiff satisfies this initial burden, then the court determines whether the right was "clearly established" at the time of the violation.  <u>Hope</u>, 536 U.S. at 739; <u>Saucier</u>, 533 U.S. at 201; <u>Williams</u>, 352 F.3d at 1002; <u>Hare v. City of Corinth</u>, 135 F.3d 320, 325-26 (5th Cir. 1998)[hereinafter "Hare II"].  A legal right is "clearly established" if pre-existing law sufficiently defines the right so that a reasonable public official would understand whether his actions were constitutional in the situation confronting him.  <u>Hope</u>, 536 U.S. at 739; <u>Williams</u>, 352 F.3d at 1002-03.  <u>See also</u> <u>Petta v. Rivera</u>, 143 F.3d 895, 899 (5th Cir. 1998) ("[F]or a right to be 'clearly established' we require that its 'contours . . . must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'").  However, it is not necessary that prior cases have held the particular action(s) in question to be unlawful.  <u>Id.</u>

If the legal rules are sufficiently clear, then a plaintiff must ultimately prove that the official's actions were objectively unreasonable within that legal context.  <u>See</u> <u>Saucier</u>, 533 U.S. at

208; Hare II, 135 F.3d at 326.   The defendant official's actions are held to be objectively reasonable unless all reasonable officials in the same circumstances would have recognized that the defendant's conduct violated the plaintiff's constitutional rights. Id.  If the evidence gives rise to a difference of opinion as to the lawfulness of the action among reasonably competent officers, the official is entitled to qualified immunity.  Malley v. Briggs, 475 U.S. 335, 341 (1986).   Reasonableness may be decided as a matter of law provided that the underlying facts are not in dispute.  Lampkin v. City of Nacogdoches, 7 F.3d 430, 435 (5th Cir. 1993).

Defendants Wolsey and Gonzalez assert their entitlement to qualified immunity as to all of Plaintiff's alleged constitutional claims.  Defendants contend that their actions were objectively reasonable based upon the law at the time of the encounter with Plaintiff.  In response, Plaintiff asserts that factual issues preclude Defendants' entitlement to qualified immunity.  Because Plaintiff alleges various violations of his constitutional rights throughout his encounter with Defendants Wolsey and Gonzalez, the court addresses each alleged violation separately.

### A.   Initial Traffic Stop

The Fourth Amendment guarantees people the right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.  Whren v. United States, 517 U.S. 806, 809-

24

10 (1996).  The stopping of a vehicle constitutes a seizure under the Fourth Amendment and, thus, must not be unreasonable.  Id. at 810.

The decision to stop an automobile is reasonable "where the police have probable cause to believe that a traffic violation has occurred."   Id.   Moreover, where there is reasonable and articulable suspicion that a person has committed or is about to commit a crime, limited searches and seizures are permissible despite a lack of probable cause.  United States v. Jenson, 462 F.3d 399, 403 (5th Cir. 2006); Terry v. Ohio, 392 U.S. 1, 21 (1968).  To state a claim for an unlawful stop, Plaintiff must demonstrate that Defendant Wolsey's decision to stop his automobile was "unreasonable under the circumstances."  See Wren, 517 U.S. at 810.

Defendants contend that Plaintiff's Fourth Amendment rights were not violated when Wolsey stopped Plaintiff's vehicle because, through his radar detector, Defendant Wolsey determined that Plaintiff was traveling at seventy miles per hour, five miles over the speed limit of sixty-five.  In response, Plaintiff argues that he was traveling with the flow of traffic and at the speed limit when Defendant Wolsey pulled him over.[88]  He also claims that the warning ticket he received indicates that he was traveling sixty-

---

[88]    Plaintiff's Declaration, p. 1.

25

five miles per hour.[89]   Competent summary judgment evidence in the form of affidavits or declarations supports both parties' contentions.[90]   Although seemingly minor, this factual dispute is critical to the determination of whether Defendant Wolsey violated Plaintiff's rights.   In this case, speeding is the sine qua non of constitutionality.   If Plaintiff was not speeding, Defendant Wolsey did not have probable cause to stop Plaintiff and the traffic stop violated the Fourth Amendment.   By raising a fact issue on this point, Plaintiff meets his initial burden of presenting evidence of a constitutional violation.

The court must next determine whether the constitutional right at issue was clearly established at the time of the alleged violation.   Here, the law was clear in 2005 that an officer must have probable cause to stop and detain a person operating a vehicle.   See Whren, 517 U.S. at 809-10 (holding as much in 1996).

Assuming Plaintiff's account to be true, without more to raise suspicion or probable cause, a reasonable officer would know that stopping Plaintiff's vehicle was unreasonable under the

---

[89]   Id. at 9.   Plaintiff has not produced the warning ticket as summary judgment evidence.

[90]   Defendants offer the testimony of Lt. James B. Holland regarding the use of radar equipment and Defendant Wolsey's training to support their assertion that probable cause existed for the initial stop and detention of Plaintiff.   Defendants' Motion for Summary Judgment Appendix, Docket Entry No. 50, p. 7, Affidavit of Lt. James B. Holland.   However, under the circumstances, Holland's testimony is not instructive as to whether Plaintiff has alleged a constitutional violation.

26

circumstances.  Thus, Defendant Wolsey is not entitled to qualified immunity on summary judgment for his actions in the initial stop of Plaintiff.  Defendant Gonzalez was not present during the initial stop and, accordingly, has no derivative liability for the actions of Defendant Wolsey in stopping Plaintiff for speeding.

**B.   Investigative Detention**

The detention of a vehicle and its occupants during a traffic stop constitutes a "seizure" under the Fourth Amendment.  United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004).  Because it more closely resembles an investigative detention than a formal arrest, a routine traffic stop, whether justified by probable cause or a reasonable suspicion of a violation, is treated as a Terry stop.  Id.; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).  The legality of a Terry, or investigatory, stop is analyzed under a two-step inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.  Brigham, 382 F.3d at 506 (citing Terry, 392 U.S. at 19-20).  In this case, assuming the initial stop of Plaintiff is found to be lawful,[91] the court must consider whether Wolsey's and Gonzalez's subsequent actions during

---

[91]     See discussion, supra, pp. 24-26.

Plaintiff's detention were lawful.[92]

During a traffic stop, an officer may ask for a driver's license, proof of insurance, vehicle registration, and may run a computer check on the driver and the vehicle. Jenson, 462 F.3d at 403-04; United States v. Santiago, 310 F.3d 336, 341 (5th Cir. 2002). An officer may inquire into the purpose of the trip and the occupants' intended destination. Jenson, 462 F.3d at 404; Brigham, 382 F.3d at 508. A police officer's questioning "even on a subject unrelated to the purpose of a routine traffic stop," is by itself not a violation of the Fourth Amendment. Id.; United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993).

However, during a traffic stop, the investigative methods used by the police "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Grant, 349 F.3d at 196 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). Once an officer's suspicions have been verified or dispelled, i.e., after the officer completes a computer check and issues a citation or determines that none should be issued, the detention must end unless there is additional articulable, reasonable suspicion. Grant, 349 F.3d at 196; see also Brigham, 382 F.3d at 507 (instructing that the detention must "last no longer than is necessary to effectuate the purpose of the

---

[92]    On the other hand, if the finder of fact determines that the initial traffic stop was without probable cause, Plaintiff's continued detention was unjustified and Defendant Wolsey may not assert qualified immunity for his continued actions detaining Plaintiff. Grant, 349 F.3d at 196.

stop, unless further reasonable suspicion, supported by articulable facts, emerges").

Reasonable suspicion exists when the detaining officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure]." Terry, 392 U.S. at 21; Grant, 349 F.3d at 196; Santiago, 310 F.3d at 340. "The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch." United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000).

When making a reasonable suspicion determination, the court must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. Grant, 349 F.3d at 197. This court is required to "consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." Brigham, 382 F.3d at 507.

Defendant Wolsey asserts entitlement to qualified immunity for the detention of Plaintiff following the initial traffic stop because his actions were objectively reasonable. Wolsey contends that he had a reasonable suspicion to justify his initial detention

29

and continued questioning of Plaintiff based upon inconsistencies between: (1) the origin of travel (Washington); (2) the state which issued Plaintiff's driver's license (Ontario, Canada); (3) the fact that Plaintiff's vehicle was owned by a leasing company and leased to a company in a state other than that of Plaintiff's origin (Albuquerque, New Mexico); (4) Plaintiff's initial vagueness in describing his travel plans (uncertain intermediate destination and indefinite directions); and (5) Plaintiff's body language (shaking hands and failure to make eye contact).  Wolsey asserts that he was lawfully authorized to question Plaintiff regarding the purpose of his travel, his destination, and other related matters and that Plaintiff's responses were "abnormal in comparison to his usual violator contacts."[93]

Plaintiff argues that, after Plaintiff produced a valid driver's license and the computer check revealed no anomolies, any further questioning by Wolsey unlawfully extended the duration of the detention.  Plaintiff asserts that Wolsey based his detention of Plaintiff to await the canine unit wholly upon a "vague and unsupported hunch," and that no specific fact particular to Plaintiff's statements, history, vehicle, or the contents of his vehicle in any way suggested that he was involved in drug-related

---

[93]    Defendants' Motion for Summary Judgment Appendix, Docket Entry No. 50, Wolsey Affidavit, p. 2.

activity.[94]  With the exception of where he was to drop off the
furniture and exactly where he would stay, Plaintiff contends, he
advised Defendant Wolsey of the purpose of his trip, his
destination, and the route he would take without inconsistencies.
Plaintiff also contends that the length of his detention was
unreasonable.

The precise issue here is whether Plaintiff's actions and
demeanor during the initial traffic stop were sufficient to give
rise to reasonable suspicion by Wolsey that Plaintiff was involved
in criminal activity to justify additional questioning about his
travel and continued detention pending the dog sniff.

Beyond disputing Defendant Wolsey's characterization and
interpretation of the facts and circumstances surrounding the
incident at issue, Plaintiff does not dispute the facts giving rise
to Defendant Wolsey's alleged reasonable suspicion.  Plaintiff does
not dispute that he was (a) driving from Washington, through
California in a vehicle rented from a New Mexico company,[95] (b)
using a driver's license issued in Canada, (c) in a truck not
leased in his name, (d) on his way to a destination of which he was
not sure, and (e) driving along a route that he was uncertain was
even open all the way to his destination.[96]  See United States v.

---

[94]    Plaintiff's Opposition, Docket Entry No. 56, p. 17.

[95]    Complaint, Docket Entry No. 18, p. 5.

[96]    Plaintiff's Declaration, p. 3.

<u>Henry</u>, 372 F.3d 714, 715-16 (5th Cir. 2004) (finding reasonable suspicion based, in part, on the plaintiff's inability to provide detail about his travel plans). Plaintiff reported that he worked "off and on" and "here and there," statements which seem inconsistent with having an accountant who advised leasing a vehicle from a New Mexico company. Plaintiff does not dispute that his first response to Wolsey's inquiry into his travel plans was to generally tell Wolsey that he was heading to "the Gulf."[97] The most detailed statement given by Plaintiff was that he was going to "New Orleans, maybe Biloxi, depend[ing] on where they want the stuff dropped off."[98] In addition, Plaintiff never divulged where he lived to explain his Ontario, Canada driver's license but merely stated that he lived in Seattle when he was in Washington and that he owned property in Ontario. Plaintiff does not dispute that he failed to make eye contact or that his hands were shaking. <u>See id.</u> (considering nervousness a factor in finding reasonable suspicion); <u>Brigham</u>, 382 F.3d at 504 (finding that "increasing suspicion was fueled by . . . extreme nervousness, [and] his avoidance of eye contact"); <u>Grant</u>, 349 F.3d at 198 (considering the appearance of nervousness as a factor in creating reasonable suspicion); <u>see also</u> <u>Jenson</u>, 462 F.3d at 404-05 (stating that "We have previously found detentions unreasonable, based on totality of circumstances, where

---

[97]   <u>Id.</u> at 2.

[98]   <u>Id.</u>

driver exhibited signs of nervousness.").

Plaintiff's inconsistent or evasive answers to straightforward questions about his residence, travel plans and intended destination, as well as travel along a major drug corridor, provided a reasonable suspicion of illegal activity justifying Wolsey's continued questioning of Plaintiff, the subsequent request for a consent search of the truck and the continued detention pending the dog search.  The court finds that Plaintiff failed to offer evidence of a constitutionally infirm detention.  Defendant Wolsey is entitled to qualified immunity on this alleged violation. Defendant Gonzalez was not involved in the investigative detention of Plaintiff and has no derivative liability under the facts as stated by Plaintiff.

### C.  Search

The Fourth Amendment generally requires police to secure a warrant before conducting a search.  Maryland v. Dyson, 527 U.S. 465, 466 (1999).  However, there is an exception in the context of vehicles, wherein a search may be justified by probable cause.  Id. at 466-67; United States v. Dovali-Avila, 895 F.2d 206, 207 (5th Cir. 1990).

A canine sniff does not in and of itself constitute a search, as legitimate privacy interests are not implicated when "a well-trained narcotics-detection dog, one that does not expose non-contraband items that otherwise would remain hidden from public

view," is used during a lawful traffic stop.  <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005) (internal quotations omitted); <u>see also</u> <u>United States v. Place</u>, 462 U.S. 696, 707 (1983); <u>Dovalia-Avila</u>, 895 F.2d at 207-08.   However, a drug-sniffing canine alert is sufficient, standing alone, to provide probable cause for a search. <u>United States v. Sanchez-Pena</u>, 336 F.3d 431, 444 (5th Cir. 2003); <u>Resendiz v. Miller</u>, 203 F.3d 902, 903 (5th Cir. 2000).  If probable cause to search a vehicle is developed on site as a result of a dog sniff, a showing of the dog's training and reliability is not required.   <u>Sanchez-Pena</u> (discussing <u>United States v. Williams</u>, 69 F.3d 27, 28 (5th Cir. 1995)); <u>see also</u> <u>United States v. Stevenson</u>, 274 F.Supp.2d 819, 822 (S.D. Tex. 2002) ("[T]he production of a dog's performance and training records is not necessary to establish a dog's training and reliability.").

Plaintiff asserts that the open-air search of his vehicle subsequent to the traffic stop was conducted by an "extraordinarily poorly trained" narcotics detection team, resulting in the exposure of non-contraband items which would have otherwise remained hidden. Plaintiff argues, inter alia, that Defendant Gonzalez was ignorant of canine drug detection terminology, did not know how to avoid "false alerts," and was not able to confirm that he passed his most recent annual certification. To support of his argument that Defendant Gonzalez was poorly trained, Plaintiff cites to the report of an expert witness that details "critical errors" made by

Defendant Gonzalez that "affected the integrity of the alert."[99]

Here, Defendant Gonzalez's affidavit explicitly states that he was trained in dog handling and certified as a dog handler at the time of the incident in question.[100]  Defendant Gonzalez stated that the drug dog used during Plaintiff's detention was also certified at the time of the incident.[101]  This is sufficient evidence to establish probable cause based on the dog sniff. See Sanchez-Pena, 336 F.3d at 444 (instructing that "a showing of the dog's training and reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle"); Stevenson, 274 F.Supp.2d at 823 (holding that credible testimony from a trainer or handler of a narcotics-detecting dog, as to the dog's training, certification, and performance on the day in question, supports a determination that a dog is trained and reliable for purposes of establishing probable cause to search).

Probable cause also justified the search of the black briefcase found in Plaintiff's truck.  "Where probable cause justifies the search of a lawfully stopped vehicle, 'it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.'" United States v. Castelo, 415

---

[99]    Plaintiff's Opposition, Docket Entry No. 56, p. 29; Plaintiff's Designation of Expert Witnesses, Docket Entry No. 48, Ex. B, Traffic Stop Report, p. 7-9.

[100]   Gonzalez Affidavit, p. 4.

[101]   Id.

F.3d 407, 412 (5th Cir. 2005) (quoting <u>United States v. Ross</u>, 456
U.S. 798, 825 (1982)).   There is no requirement that a showing of
individualized suspicion be made for each package or container
searched within a vehicle.   <u>Wyoming v. Houghton</u>, 526 U.S. 295, 302
(1999).   If Plaintiff's vehicle is found to have been lawfully
stopped and probable cause justified the search of Plaintiff's
truck, then so justified is the search of the briefcase.

Accordingly, Plaintiff has failed to establish a violation of
his Fourth Amendment right to be free from unreasonable searches.
Defendants Wolsey and Gonzalez are entitled to qualified immunity
for their actions in searching Plaintiff's vehicle and its
contents.

**C.   <u>Continued Detention</u>**

Brevity of the invasion upon an individual's Fourth Amendment
rights is a factor to be considered in justifying a seizure on
reasonable suspicion.   <u>United States v. Place</u>, 462 U.S. 696, 709
(1983).   The Fifth Circuit also instructs that there is "no
constitutional stopwatch on traffic stops."   <u>Brigham</u>, 382 F.3d at
512; <u>see also</u> <u>United States v. Schlieve</u>, 159 Fed. Appx. 538, 544,
2005 WL 3105821 (5th Cir. 2005) ("The police were not dilatory in
following up on their suspicions, despite the fact that it was over
an hour between the return of the license and the arrival of the
dog.").   The relevant question in assessing whether a detention
extends beyond a reasonable duration is "whether the police

36

diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Id. (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)).

Here, Plaintiff argues that the length of Plaintiff's detention was unreasonable because he should not have been detained for an open air dog search.

The videotape of the incident showed that Plaintiff was stopped at 7:10 p.m., questioned by Wolsey until 7:18 p.m., when Wolsey radioed for a check of Plaintiff's driver's license. Wolsey received word from the dispatcher on the license at 7:23 p.m., asked permission to search the truck at 7:24 p.m., and radioed for a canine unit at 7:25 p.m. Plaintiff makes no specific assertion that this fifteen-minute investigative detention period was unreasonable and the court does not find it so.

The videotape also showed that twenty-five minutes passed between the time that Wolsey radioed for a canine unit and the arrival of Defendant Gonzalez with the dog. On the videotape, Wolsey explained to Plaintiff that the canine unit was on a call elsewhere and would arrive shortly. Plaintiff has not rebutted that statement or raised a fact issue by other evidence that there was either an intentional delay in Gonzalez's arrival or that the twenty-five-minute-arrival time was unreasonable under the actual circumstances. The court finds that there is no evidence to support a finding that Plaintiff's detention from 7:25 p.m. to 7:50

p.m. was unreasonable.

Even if Plaintiff had met his burden to present evidence of a constitutional violation, taking the facts as set forth by Plaintiff, he has not met his burden to show that Defendants' actions were objectively unreasonable within the context of this case.  The court does not agree all reasonable officers in the same circumstances as Defendants would have recognized that their conduct, i.e., making a motorist wait twenty-five minutes for the arrival of a canine unit after a determination of reasonable suspicion of illegal activity, violated Plaintiff's constitutional rights.  See Saucier, 533 U.S. at 208; Hare II, 135 F.3d at 326. Plaintiff has not overcome Defendants' assertions of qualified immunity for their actions during Plaintiff's detention.

> **D.  Arrest**

A prolonged investigative detention may reach a point where it is "tantamount to a de facto arrest" and must be based upon probable cause rather than merely reasonable suspicion.  See United States v. Zucco, 71 F.3d 188, 191 (5th Cir. 1995).

The line between a valid investigatory stop and an arrest requiring probable cause is a thin one.  United States v. Hanson, 801 F.2d 757, 763 (5th Cir. 1986).  Traffic stops, in particular, are considered more similar to investigative detentions than formal arrests.  United States v. Valadez, 267 F.3d 395, 397 (5th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).

Whether a detention constitutes an arrest or merely an investigative detention depends on the reasonableness of the police action under the circumstances, including the length of the stop.[102] United States v. Sanders, 994 F.2d 200, 206-07 (5th Cir. 1993); United States v. Martinez, 808 F.2d 1050, 1053 (5th Cir. 1987). Police detention constitutes an "arrest" if a reasonable person in the suspect's position would understand the situation to be a "restraint on freedom of the kind that the law typically associates with a formal arrest." Freeman v. Gore, 483 F.3d 404, 413 (5th Cir. 2007).

The Fifth Circuit is clear that using force on a suspect, drawing a weapon, ordering a suspect to lie on the ground, or placing the suspect in handcuffs, either singly or in combination, do not automatically convert a detention into an arrest. United Campbell, 178 F.3d at 349; Sanders, 994 F.2d at 206; see also United States v. Estrada, 459 F.3d 627, 634-35 (5th Cir. 2006).

In his response to Defendants' motion, Plaintiff asserts that his detention was not merely an investigatory detention, but reached the level of an arrest based on the presence of three officers, the use of handcuffs, his detention in the police car, their yelling when he requested to leave,[103] and the overall nature

---

[102]   See discussion, supra, pp. 35-37.

[103]

39

of the search and seizure.[104]

Under the circumstances as described by Plaintiff, the court finds that the officers were reasonable in their actions and the investigatory detention of Plaintiff did not rise to the level of an arrest. Plaintiff was not put in handcuffs until immediately before the search and was released when the search was complete. The officers were justified in taking measures to assure their safety. It was also reasonable for the officers to place Plaintiff in a patrol car, for his safety and the safety of the officers. Plaintiff was pulled over along a busy highway at night and had asked to await the arrival of the canine unit in the patrol car because he was cold. The court does not find Defendants' alleged yelling instructive as to whether Plaintiff's detention reached the equivalent of an arrest without probable cause.

Plaintiff's unlawful arrest allegation does not overcome Defendants' assertions of qualified immunity regarding Plaintiff's

---

[104]   Plaintiff discusses at length the case of <u>Martin v. Tipton</u>, No. 9:05CV119, 2006 WL 1804621 (E.D. Tex. 2006) to support his argument that Plaintiff was arrested without probable cause. Plaintiff suggests that "the methodology employed to stop and detain Plaintiff – to interrogate him beyond the scope of purpose of the stop, to call a canine unit and to search the vehicle he was driving – had less to do with probable cause than with a culture within the TDPS which endorses constitutionally inadequate customs and practices." Plaintiff's Opposition, Docket Entry No. 56, p. 25. However, the court finds Plaintiff's argument unavailing and irrelevant to the court's qualified immunity determination on this issue. Plaintiff provides no explanation regarding how this case supports his assertion that his detention constituted more than an investigatory detention. The <u>Martin</u> court did not even discuss de facto arrest.

detention.

**E.  Use of Force**

A claim that a police officer used excessive force during the course of an arrest, investigatory stop, or other "seizure" of a person is analyzed under the Fourth Amendment protection against unreasonable seizures of the person.  Graham v. Connor, 490 U.S. 386, 388, 394-95 (1989); Stroik v. Ponseti, 35 F.3d 155, 157 (5th Cir. 1994).[105]  To state a claim for excessive force in violation of the constitution, a plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was clearly excessive to the need and (3) the use of force was objectively unreasonable.  Bush v. Strain, 513 F.3d 492, 500-01 (5th Cir. 2008); Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999).

A plaintiff's resulting injury need not be significant, but must be more than de minimis.  See Freeman, 483 F.3d at 416; Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001).  To determine whether an injury is more than de minimus, the particular context in which the force was deployed must be examined.  Id.

The court carefully examines the facts and the totality of the

---

[105]     Plaintiff cites Tenth Circuit case law and asserts that Plaintiff's excessive use of force claim should be analyzed as an Eighth Amendment claim against cruel and unusual punishment.  Plaintiff's Opposition, Docket Entry No. 56, p. 30.  However, the Fifth Circuit is clear in that the Fourth Amendment provides the governing constitutional standard for this issue.  See Graham v. Connor, 490 U.S. 386, 394-95 (1989) ("all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach").

circumstances confronting the officers in order to decide whether their actions were objectively reasonable.  Graham, 490 U.S. at 396; see also Saucier, 533 U.S. at 207;  Mace, 333 F.3d at 624. The reasonableness of an officer's use of force is judged from the perspective of a reasonable officer on the scene, without the benefit of hindsight.  See Graham, 490 U.S. at 396; Mace, 333 F.3d at 625.  The court does not "engage in second-guessing officers in situations in which they have to make split-second, on-the-scene decisions" about how much force to employ.  Wagner v. Bay City, Tex., 227 F.3d 316, 321 (5th Cir. 2000); see also Graham, 490 U.S. at 396-97; Mace, 333 F.3d at 624.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . ."  Graham, 490 U.S. at 396; see also Saucier, 533 U.S. at 208.

Defendant Wolsey asserts that he is entitled to qualified immunity because his use of force was reasonable under the circumstances.[106]  Plaintiff contends that the manner in which Defendant used the handcuffs was excessive and resulted in a

---

[106]    Plaintiff identifies Defendant Wolsey as the person who handcuffed him.  Without specific facts detailing Defendant Gonzalez's participation in the handcuffing, he cannot be held liable for Wolsey's actions.  See Plaintiff's Response to Defendants' Motion for Summary Judgment, Docket Entry No. 56, p. 17.

neurological injury.[107]   However, Plaintiff has failed to produce sufficient summary judgment evidence to indicate that he suffered a neurological injury that resulted directly and solely from Wolsey's applying handcuffs to his wrists.   The videotape of the incident shows that Plaintiff failed to mention that he was suffering pain from the handcuffs during the two occasions that Wolsey conversed with him.   Plaintiff contends that he informed the officers of his muscle condition and also complained of the pain and discomfort he was suffering due to the handcuffs.   However, his claims of pain and discomfort do not raise his injury level above the de minimus level.   See Glenn, 242 F.3d at 314 (finding the contention that handcuffs were too tight, even if the tightness caused the wrists to swell, to be insufficient, as a matter of law, to amount to excessive force); Bramer, 180 F.3d at 704 (finding that a plaintiff's loss of breath, dizziness, and coughing while an officer searched his mouth did not amount to a cognizable injury).[108]   The use of handcuffs to restrain a suspect during a

---

[107]    Plaintiff asserts alternative ways in which he could have been restrained during the search of his vehicle.  The court does not disagree that there may have been other, perhaps less intrusive, ways to detain Plaintiff; however, the reasonableness of an officer's use of force is judged from the perspective of a reasonable officer on the scene and without the benefit of hindsight.   See Mace v. City of Palestine, 333 F.3d 621, 624 (5th Cir. 2003)(emphasis added).

[108]    The court in Bramer found injuries (dizziness, loss of breath, and coughing) legally insufficient when they resulted from a permissible physical search, but the same injuries were found sufficient when they resulted from a use of force motivated by malice.  It was later clarified on rehearing, 186 F.3d 633, 634 (5th Cir.1999), that  the officer's subjective intent was irrelevant to the Fourth Amendment analysis but was considered as it beared on whether the plaintiff alleged conduct without an apparent law enforcement-related purpose.

search, in and of itself, is not unreasonable. See Glenn, 242 F.3d at 314 ("handcuffing too tightly, without more, does not amount to excessive force").

The only evidence of injury that Plaintiff offers beyond these contentions is a medical report evaluating Plaintiff's lower legs dated eleven months after the traffic stop.[109]    Plaintiff fails to explain how a needle electromyogram (EMG) test on his legs supports his contention that the handcuffs caused severe pain in his wrists, arms and shoulders.    Plaintiff provides no evidence, other than his own lay opinion, to connect any neurological injury to Defendants' actions, much less to show that such injury resulted solely from their actions, as required to show excessive force. The court finds that Plaintiff has failed to meet his burden to show a constitutional injury.

Accordingly, Defendants are entitled to summary judgment as to Plaintiff's excessive force claim.

**F.    Right to Interstate Travel**

The Supreme Court has stated, "The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal union." United States v. Guest, 383 U.S. 745, 757 (1966).

---

[109]    Plaintiff's Opposition, Docket Entry No. 56, Ex. K, Medical Report, p. 1.

44

Without any discussion or legal citation, Plaintiff argues that the he has a right to "unimpeded interstate travel" and that the enforcement of speed limits on I-10 by state law enforcement officers violated this right.  Defendants acknowledge the right to travel between the states and assert qualified immunity, claiming they were justified in their temporary detention of Plaintiff, therefore the burden shifts to Plaintiff to show that their conduct violated his constitutional right to travel.

Plaintiff makes no such showing.  There is no question that Plaintiff is required to obey the traffic laws of the states in which he travels, even when he travels on an interstate highway. A police officer does not interfere with this Constitutional right by merely stopping a person for speeding.  Here, if the finder of fact determines that Plaintiff was wrongfully seized because he was traveling at or under the speed limit, that finding triggers a Fourth Amendment violation but does not affect Plaintiff's ability to travel state to state any differently than it would affect a similarly-situated person who was only traveling between Sealy, Texas, and Houston, Texas.  Accordingly, the court finds that Plaintiff has failed to state a separate Constitutional violation for interference with the right of interstate travel.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendants'

Motion for Summary Judgment be **GRANTED IN PART** and **DENIED IN PART**. As the court has found that the only fact issue on the federal claims is whether Defendant Wolsey had reasonable cause to stop Plaintiff for speeding on December 12, 2005, it is further **RECOMMENDED** that Defendant Gonzalez be **DISMISSED** as a party to the federal claims.   Both Defendants remain parties to the state claims.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, either electronically or by mail to P.O. Box 61010, Houston, Texas, 77208.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk Street, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 3rd day of June, 2008.

Nancy K. Johnson
United States Magistrate Judge

46